PEOPLE EX REL. ASPEN M. & S. CO. v. DISTRICT COURT OF PITKIN COUNTY.

1. When, in proceedings to condemn lands for a private railroad, the judge, under the eminent domain act, enters an interlocutory order granting the petitioners possession of the land pending the proceedings, it is not error for the court, when it sustains a general demurrer to the petition, to vacate such rule, as the statute referred to leaves the matter of granting such a rule, in the first place, entirely in the discretion of the court.

2. Where, in proceedings under the eminent domain act to condemn lands for a private railroad, the judge vacates an order granting the petitioners possession of the land pending the proceedings, he cannot be said to have abused his discretion when it appears that the right to condemn the land in controversy did not exist.

3. The power of congress to govern a territory of the United States is conceded to be supreme.   It may authorize the organization of a local government, with authority to enact laws, and it may legislate directly for the government of the territory.   But upon the admission of a territory into the Union as a sovereign state the right of local self-government passes to the state.

4. Subject to exceptions falling within the enumerated powers of the federal government, a state has the exclusive power to regulate its own domestic affairs.

5. Unless a state statute imposing an easement upon mining claims is in accord with the state constitution it cannot be enforced by our courts.

6. The constitution recognizes the right to appropriate private property for private ways of necessity, but not for the construction upon and over it of private railroads.

CERTIORARI *to District Court of Pitkin County;* THOMAS A. RUCKER, *Judge.*

THE relator is the owner of several mining claims situated on Aspen mountain, in Pitkin county; and in order to facilitate the transportation of ores therefrom to certain sampling works in the town of Aspen, known as the "Hewitt Sampler," laid out and constructed tramways from the mines to a common point in the vicinity, and laid out a main line extending from the point of convergence to the sampling works. This main line crosses a parcel of land severally claimed by three persons; by two of them as mining locations, and by the third under a pre-emption location as agricultural land. The strip desired for the tramway is one hundred and ninety-three feet in length and thirty-three feet in width. Being unable to obtain the right of way over this tract from the several claimants, the relator filed a petition in the district court of Pitkin county praying that the strip described therein be condemned, under the eminent domain act, for the purpose mentioned, and that the petitioner be admitted into possession pending the proceedings, upon depositing in the court a sum of money, to be fixed by the judge, sufficient to pay a reasonable compensation for the land when the same should be ascertained. Upon filing the petition, together with affidavits in support of its averments, a summons issued to the parties claiming the land, and the court entered a rule authorizing the relator to take possession, on depositing with the clerk

of the court the sum of $200. This sum was deposited, possession taken, and the construction of the tramway across the tract commenced before the return day named in the summons. A general demurrer to the petition on part of the pre-emption claimant was subsequently filed, which was sustained by the court, and thereupon the rule for possession was vacated and set aside as to the said claimant, exceptions being reserved to the rulings. An appeal from the last-mentioned order was prayed and denied.

Messrs. GEO. J. BOAL and C. S. WILSON, for petitioners.

Messrs. A. HEIMS and T. C. MCDEVIT, for respondents.

BECK, C. J.  This is a proceeding to review, upon a writ of *certiorari*, an order of the court below vacating and setting aside a rule, previously entered by it, granting to the relator possession of a strip of land pending proceedings instituted for its condemnation, under the eminent domain statute, for the purpose of a tramway. The statute referred to permits the court or judge, at any stage of the proceedings, to enter a rule authorizing the petitioner to take possession and use the premises sought to be condemned on depositing in court a sum of money, to be fixed by the judge, sufficient to pay compensation for the land taken, when the amount thereof shall be ascertained. The proceeding was instituted by a private corporation, and the use for which the land was sought to be appropriated was a private use. The supposed errors complained of are: *First*, that the court, in vacating the rule for possession pending the proceeding for condemnation, exceeded its jurisdiction; *second*, that, in vacating the rule, it greatly abused its discretion.

There is nothing in the first alleged error. The rule granting possession pending the proceedings was discretionary, and might have been denied by the judge. In many cases instituted under this statute it is the duty of

the judge to decline to enter such rule. If, therefore, the rule be granted, and the court subsequently ascertains that its discretion was improvidently exercised, an interlocutory order vacating and setting it aside cannot be impeached for want of jurisdiction. As declared by the court in *Templeton v. District Court*, 47 Cal. 70, the authority to set aside the order is as clear as the authority to enter it in the first instance.

In respect to the alleged abuse of discretion, it is a safe proposition that, if the right to condemn the strip of land for the purposes specified in the petition did not exist, the court did not abuse its discretion in rescinding the order granting possession. The right claimed is based upon the fifth section of the act of congress of July 26, 1866, entitled " An act granting the right of way to ditch and canal owners over the public lands, and for other purposes " (U. S. St. at Large, 1866, p. 252), and upon the eleventh section of an act of the legislature of the late territory of Colorado, approved February 13, 1874, entitled "An act concerning mines " (Laws 1874, p. 188). Neither of the sections mentioned has been repealed, but each has been embodied in subsequent revisions. The former now appears as section 2338, Revised Statutes of United States, and is as follows: " As a condition of sale, in the absence of necessary legislation by congress, the local legislature of any state or territory may provide rules for working mines, involving easements, drainage and other necessary means to their complete development; and those conditions shall be fully expressed in the patent." The other provision constitutes section 2407, General Statutes of Colorado, and is in the following words: "All mining claims now located, or which may be hereafter located, shall be subject to the right of way of any ditch or flume for mining purposes, or of any tramway or pack-trail, whether now in use, or which may be hereafter laid out across any such location: provided, always, that such right of way shall not be exer-

cised against any location duly made and recorded, and not abandoned prior to the establishment of the ditch, flume, tramway or pack-trail, without consent of the owner, except by condemnation, as in case of land taken for public highways. Parol consent to the location of any such easement, accompanied by the completion of the same over the claim, shall be sufficient without writings: and provided, further, that such ditch or flume shall be so constructed that the water from such ditch or flume shall not injure vested rights by flooding or otherwise."

It is not contended on part of the relator that the provision of the latter section relating to tramways is not in conflict with the state constitution; but it is argued that the foregoing provisions of the act of congress imposed upon the land in question, as a condition of sale, the easements mentioned in the territorial (now state) statute. Says counsel: "He who acquires mineral land from the general government cannot divest the grant of the conditions with which it passes. State constitutions can neither abridge the authority of an act of congress nor strip it of the limitations and conditions it imposes. Congress is powerful, and may ignore, as it does, state constitutions, and, in broad terms, authorize local legislatures, regardless of the constitution of the state, ' to provide rules for working mines;' rules 'involving easements' securing the necessary ingress and egress to one mine over another, or other mineral lands, in working such mine." The provision of the act of congress relates both to state and territorial legislatures. The power of congress to govern a territory of the United States is conceded to be supreme. It may authorize the organization of a local government with authority to enact laws, and it may legislate directly for the government of the territory. *Bank v. County of Yankton,* 101 U. S. 129. But, upon the admission of a territory into the Union as a sovereign state, the right of local self-government passes to the state. The power of legisla-

tion thereafter resides in the people of the state, and is absolute and uncontrolled, save as to the enumerated powers reserved to the national government by the federal constitution and the restraints upon state legislation imposed by that instrument. It is provided by the tenth amendment thereto that "the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." Other limitations upon the powers of the legislative department of a state are to be found in the state constitution. Cooley, Const. Lim. 10, 206, and notes. Among the powers pertaining to a state as an independent sovereignty, and necessary to enable it to perform its public functions, is the authority to make and enforce laws for its government and for the welfare and protection of its citizens and their property. Subject to exceptions falling within the enumerated powers of the federal government, a state has the exclusive power to regulate its own domestic affairs. This includes the power to control private property within its limits and to establish rules and regulations for its enjoyment and use. It may impose restraints upon the owners thereof as to the manner of its enjoyment; and in proper cases and in a constitutional manner may partially or wholly deprive them of its use and appropriate it to other uses. Sedg. St. & Const. Law, 423–450; Mills, Em. Dom. § 9 *et seq.* One of the powers of state sovereignty which may be exercised in the regulation and control of private property is termed the right of eminent domain. Concerning this power Judge Cooley says: "As, under the peculiar American system, the protection and regulation of private rights, privileges and immunities in general belong to the state governments, and those governments are expected to make provision for the convenience and necessities which are usually provided for their citizens through the exercise of the right of eminent domain, the right itself, it would seem, must pertain to those governments

also, rather than to the government of the nation; and such has been the conclusion of the authorities." Cooley, Const. Lim. 650. Exceptions to the rule, in favor of the exercise of this right within a state by the federal government, are noted by the author, and well stated by Mr. Justice Strong in *Kohl v. United States*, 91 U. S. 367. They extend to appropriations by the United States of the property of citizens of a state for sites for postoffices, court-houses, forts, arsenals, light-houses, custom-houses and other public uses. It was also held in *United States v. Bridge Co.* 6 McLean, 517, that, while congress can make all needful rules and regulations relative to the disposition and protection of public lands within the limits of a state, beyond this it can exercise no other acts of sovereignty which it might not exercise over the lands of individuals. That, subject to such proprietary rights, the sovereignty of the state extends to all the territory within its limits, and in the discharge of the ordinary functions of sovereignty the state may establish easements as well upon the lands owned by the United States as upon lands owned by individuals.

The foregoing principles, declaratory of the sovereign powers pertaining to the federal and state governments respectively, do not sustain the broad proposition of counsel that congress may ignore state constitutions, and authorize local legislatures, regardless of state constitutions, to pass laws providing rules for the working of mines, and involving easements upon mineral lands. It is the solemn duty of the courts of a state to enforce the state constitution as the paramount law, whenever an act of the state legislature is found to be clearly in conflict therewith. Assuming that the state constitution is itself a valid instrument, the authority of congress to authorize the state legislature to pass laws upon any subject in conflict therewith cannot be admitted. But congress has not assumed to exercise such a power. The rules and easements intended to be authorized by the fifth section of the congressional act of July 26, 1866,

were evidently such as should be enacted in accordance with the fundamental law of the state or territory. Considered with reference to the territories, the section is unobjectionable in any view of the question, since, as we have seen, the power of congress to govern them is absolute; and it may either delegate the powers of government to the local authorities, or legislate directly for the government thereof. As applicable to the state governments, the provision may be regarded as authorizing them to supplement the act of congress with necessary and proper rules and requirements to be observed by citizens who have availed or might avail themselves of the privilege given to explore, occupy and mine the mineral lands of the public domain, with a view to acquiring title thereto. In so far as the provisions of the act may be regarded as conferring power upon the state legislature to regulate the manner of using and operating mining claims, with a view to the protection of the rights of the several claimants, and to render available their respective locations, by imposing restraints on the mode of operating and using them, including necessary easements over the same, it would seem from the authorities cited that the states already possessed this power. Being comparatively a new question, however, at the date of the passage of the congressional act, this and the other permissive clauses were properly and wisely inserted. The opinion of Mr. Justice Field in *Jennison v. Kirk*, 98 U. S. 453–460, upon other portions of this act, shows that the intention of congress by the insertion of provisions of this character was not to grant easements upon mining claims, but to sanction such as might be regularly granted by the local authorities, and in order that they might be perpetuated as property rights after the title had passed from the government. This precaution prevents any controversy in the future as to the power of either territory or state to impose easements on these lands while they belonged to the United States.

From these principles and considerations we arrive at

the conclusion that, unless a state statute imposing an easement upon mining claims is in accord with the state constitution, it cannot be enforced by our courts. The provision of the statute in question (sec. 2407, Gen. St.), that all mining claims now located, or which may be hereafter located, shall be subject to the right of way for any tramway, whether now in use, or which may hereafter be laid across any such location, to be condemned as in case of land taken for public highways when consent of the owner cannot be obtained, deals with the subject of eminent domain, or the power of the sovereign to take and appropriate private property on making just compensation therefor. In the exercise of this right the power of the legislative department is limited by the constitution to the taking of private property, without the consent of the owner, for public use, and for the following private uses, viz.: "For private ways of necessity, and * * * for reservoirs, drains, flumes or ditches * * * for agricultural, mining, milling, domestic or sanitary purposes." Const. art. 2, §§ 14, 15. The right to condemn and appropriate private property, in the present case, being for a private use, no argument is necessary to show that the taking of private property for the construction of a tramway does not fall within the exceptions specified, to which the legislative power is limited by the constitution. To this extent, therefore, the statute in question is inconsistent with the constitution, and must be held to have been repealed by it. Only the territorial laws in force not inconsistent with it were continued as laws of the state. But this ruling is limited to cases where no right of way for the use here claimed had accrued under the statute prior to the adoption of the constitution. Its validity as a territorial statute is not questioned.

Another statutory provision is cited in the briefs of relator's counsel, in connection with the one just considered, viz.: "Every miner shall have the right of way

across any and all claims for the purpose of hauling quartz from his claim." Gen. St. § 2394. While the validity of the latter section is not involved in the present case, it was argued that the logical result of denying the right to condemn and appropriate private property for the tramway was to prevent the great majority of miners from marketing their ores, since they could not get them to market without trespassing on the claims of their neighbors. The argument is based on the assumption that, if the right of way across mining locations cannot be appropriated for private tramways for transporting ores, no right of way for hauling ores from the mines in any manner exists under the laws. No such result necessarily or logically follows. The constitution recognizes the right to appropriate private property for private ways of necessity, but not for the construction upon and over it of private railroads.

The writ must be dismissed, and it is so ordered.

*Writ dismissed.*